# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2018-KA-01519-COA

DEVONTE EASTERLING A/K/A DEVONTAE             APPELLANT
EASTERLING

v.

STATE OF MISSISSIPPI                                              APPELLEE

DATE OF JUDGMENT: 07/27/2018
TRIAL JUDGE: HON. STANLEY ALEX SOREY
COURT FROM WHICH APPEALED: COVINGTON COUNTY CIRCUIT COURT
ATTORNEYS FOR APPELLANT: W. TERRELL STUBBS
 WADE THOMAS UNDERWOOD
ATTORNEYS FOR APPELLEE: OFFICE OF THE ATTORNEY GENERAL
 BY: JOHN R. HENRY JR.
 SCOTT STUART
NATURE OF THE CASE: CRIMINAL - FELONY
DISPOSITION: AFFIRMED - 06/09/2020
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

## BEFORE GREENLEE, P.J., McDONALD AND LAWRENCE, JJ.

### McDONALD, J., FOR THE COURT:

¶1. On July 26, 2018, a Covington County Circuit Court jury found Devontae Easterling guilty of first-degree murder for shooting Joshua McDonald.[1] The circuit court sentenced him to life imprisonment in the custody of the Mississippi Department of Corrections. Following the guilty verdict, Easterling filed a motion for a new trial (dated August 2, 2018) and a first amended motion for judgment notwithstanding the verdict or, alternatively, a new trial (dated August 17, 2018). The circuit court denied Easterling's motion for a JNOV or

---

[1] This individual has no relation to Judge McDonald.

a new trial on September 21, 2018.

¶2.    Easterling appealed on October 19, 2018, raising the following issues: whether the trial court erred (1) in not granting Easterling's motion for a JNOV or, alternatively, a new trial; (2) in not striking the testimony of the State's ballistics expert, Lori Beall; (3) by denying Easterling's motion to suppress the admission of his handgun; (4) in granting the State's motion to suppress the victim's toxicology report; (5) by failing to allow testimony from defense witnesses Alexander Easterling and Tyisha Duckworth; (6) by prohibiting lay-person testimony regarding the possible source of gun-powder residue found on a key eyewitness; (7) in granting the State's motion to exclude testimony regarding the prior criminal acts of the victim and testifying witnesses; and (8) in not finding Easterling's representation deficient and in not finding that the combined errors of Easterling's trial counsel prejudiced Easterling.  Finding no error, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶3.    On August 18, 2016, Joshua Lee McDonald was shot and killed in his car near 1007 Jamesville Road in Mt. Olive, Mississippi (Covington County).  Prior to the shooting, McDonald and Edmond "Loc" Clark had been working on McDonald's car.  According to Clark, a person named Devontae Easterling approached the car and shot McDonald.  Officer Layne McLaurin and Deputy Jonathan Anderson were dispatched to the location of the shooting.  Officer Joseph Barnes received a call from Deputy Anderson, telling him that Easterling wanted to turn himself into the police.

¶4.    Officer Barnes and his partner proceeded to Easterling's grandmother's (Charlene

2

Easterling) house. Easterling came out and met the officers in the driveway. Officer Barnes told Easterling to turn around. At that moment, Officer Barnes spotted a handgun in Easterling's back pocket. Officer Barnes seized the handgun and handcuffed and arrested Easterling. The police later identified the handgun as a 9mm Jimenez handgun with the serial number 365837. On the same day, Officer Russell Beasley informed Easterling of his *Miranda*[2] rights and interviewed him. Easterling denied killing McDonald.

¶5.     On January 23, 2017, a Covington County grand jury indicted Easterling for the murder of McDonald. Easterling's counsel filed a motion to suppress evidence on July 5, 2018. He argued that the 9mm Jimenez handgun should not be admitted at trial because the State failed to secure a valid search warrant before seizing it; therefore, under the Fourth Amendment, the search and seizure of the gun was improper. The circuit court denied the motion on July 19, 2018.

¶6.     On July 11, 2018, the State filed a motion in limine to exclude the results of victim's toxicology report[3] and several motions in limine to prohibit the defense from mentioning or soliciting testimony about prior criminal acts of several witnesses and the victim.[4]

¶7.     Easterling's trial took place on July 25, 2018, and July 26, 2018. Clark testified that on August 18, 2016, he was with McDonald from the morning until the time of the shooting

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[3] The record on appeal contains no transcript of a hearing on the matter. But prior to trial, the court excluded evidence of McDonald's toxicology results.

[4] The record on appeal contains no transcript of a hearing on the matter. But prior to trial, the court excluded evidence of prior criminal acts of witnesses and the victim.

3

because they were working on McDonald's car. He and McDonald were sitting in the car when Easterling walked up on them. Clark stated he heard a shot and saw Easterling at his door with a gun. After the shooting, Clark hid in the woods until he saw a car and recognized the occupants as Travis Durr and Santana Keyes. Clark got in their car but did not call the police because there was no phone available. Clark then rode to a friend's house, where he stayed until he spoke to Officer McLaurin.[5]

¶8. On cross-examination, Clark testified that there were drugs in the car at the time of the shooting; however, he denied having used any drugs at the time. Clark also stated that he could not recall what Easterling was wearing that day, what time of the day that the shooting occurred, or when he contacted the police. However, Clark did remember that the gun Easterling was carrying was black and silver, an automatic, and "looked to be a 9 millimeter or 40." He recalled all this clearly because he was "looking down the barrel of the gun when he seen it." On redirect, Clark testified that he did not murder McDonald and that he had no doubt in his mind who did: Devontae Easterling.

¶9. Outside the presence of the jury, the court ruled on Easterling's motions in limine and excluded the victim's toxicology report as well as witnesses' prior criminal-conviction histories.

¶10. The State then called Kimberly Graves, who testified that on the day of the shooting, she saw Easterling walking near "49 Jamesville" and picked him up before 12:00 p.m. Graves stated that she did not see a gun on Easterling and that he was not acting erratic.

---

[5] Clark did not remember when he contacted Officer McLaurin later that day.

4

After running a few errands, Graves dropped Easterling off at his grandmother's house. Williams, Barnes, McDonald, and Clark were all at the house. Graves then "boosted" McDonald's car. After boosting McDonald's car, Williams and Barnes got into Graves's car and drove away. As Graves was driving away, she saw Easterling on the gravel road walking down the hill toward McDonald's car.

¶11. Layne McLaurin, of the Covington County Sheriff's Office, testified that he was dispatched to the area of Jamesville Road where the shooting took place. McLaurin found McDonald in the car. McLaurin noticed two spent casings near the passenger side of the vehicle and two unfired bullet casings several feet from the vehicle toward Jamesville Road. McLaurin later spoke with Clark, who said that Easterling had shot McDonald. McLaurin testified that he and deputies with the Covington County Sheriff's Office took Easterling into custody at his grandmother's house and confiscated the handgun found on him. Officer Barnes testified that at the time he arrested Easterling, the gun was in Easterling's back pocket in plain view.

¶12. The State presented its next witness, medical examiner Dr. Mark Levaughn, who performed the autopsy of McDonald and removed a bullet from his back. Dr. Levaughn stated that the entry wound was on the right side of the neck. From there, the bullet passed through the vertebrae and continued into the tissue of McDonald's back. Dr. Levaughn further stated that McDonald's cause of death was a gunshot wound to his neck and that the manner of death was homicide.

¶13. The State also called Lori Beall, a ballistics expert, who testified that one of the spent

casing at the scene came from Easterling's gun. She also examined the bullet recovered from McDonald's body, but she could not determine whether the bullet came from the Jimenez 9mm handgun.

¶14. At the close of the State's evidence, Easterling moved for a directed verdict, arguing that the State had failed to prove all of the elements of murder. The court denied the motion.

¶15. Charlene Easterling, Devontae Easterling's grandmother, testified for the defense and presented a slightly different version of the events prior to the shooting. She said Dominique Williams and Corey Barnes were in her house, but she made them leave. As they were leaving, she saw Clark and McDonald in front of her yard trying to crank McDonald's car. Charlene told them to leave as well because "[she] was tired of them always messing up." Clark and McDonald still could not get the car to start, so they pushed the car to Calvin's (Easterling's father) house down the hill. Shortly after, Charlene stated that she heard what she thought were firecrackers at around 12:45 p.m. Charlene testified that she did not see Easterling until after the shooting when Graves dropped him off at her house. On cross-examination, the State reminded Charlene that in her statement given on the day of McDonald's death, she stated that prior to the shooting she had seen Easterling with Williams, Barnes, Clark, and McDonald. However, Charlene said that she was mistaken when she gave that statement and that Devontae would not kill anyone.

¶16. Following Charlene's testimony, the court excused the jurors to address motions concerning the defense's next witnesses. The defense proffered Alexander "Al" Easterling's (Devontae Easterling's first cousin) testimony about his conversations with both Corey

6

Barnes and Travis Durr. The defense also proffered Tyisha Duckworth's testimony about her conversation with Barnes on the night of the shooting. The State objected to both Easterling's and Duckworth's testimony on hearsay grounds. The court sustained the objections. Easterling called no other witnesses.

¶17. Both sides rested. After being instructed on the law and hearing closing arguments, the jury found Easterling guilty of first-degree murder, which by statute resulted in a sentence of life imprisonment.

¶18. Easterling's counsel filed a motion for a new trial on August 2, 2018. In support of a new trial, Easterling's counsel argued that the circuit court erred in failing to allow two witnesses, Al Easterling and Tyisha Duckworth, to testify, which affected the outcome of the case. That same day, Easterling's trial counsel filed a motion to withdraw, and Easterling obtained new counsel on August 9, 2018.

¶19. On August 17, 2018, Easterling's new counsel filed the first amended motion for a JNOV or, in the alternative, a new trial.[6] The circuit court denied Easterling's motion on September 21, 2018, because the court found that sufficient evidence existed to support the jury's finding that Easterling was guilty of first-degree murder beyond a reasonable doubt.

¶20. On October 19, 2018, Easterling appealed from the conviction and the order denying his motion for a JNOV or a new trial. On appeal, Easterling argues that the circuit court erred (1) in not granting Easterling's motion for a JNOV or a new trial; (2) in not striking the testimony of Lori Beall; (3) by denying Easterling's motion to suppress evidence regarding

---

[6] The issues raised on appeal were included in the amended motion for a new trial.

7

the handgun; (4) in granting the State's motion to suppress evidence regarding the toxicology report; (5) by failing to allow the testimony of Alexander Easterling and Tyisha Duckworth; (6) by failing to allow lay-person testimony regarding the possible source of gun powder residue found at the scene; (7) in granting the State's motion to exclude testimony regarding the prior criminal acts of Corey Barnes, Santana Keyes, Edmund Clark, and Joshua McDonald; and (8) in finding that Easterling's trial counsel was not deficient and in not finding that the combined errors of trial counsel prejudiced Easterling.

## DISCUSSION

**I.     Whether the circuit court erred in denying Easterling's motion for a JNOV or, alternatively, a new trial.**

¶21.   This court's standard of review for a trial court's grant or denial of a motion for a JNOV is de novo. *McCray v. State*, 263 So. 3d 1021, 1028 (¶24) (Miss. Ct. App. 2018). A motion for a JNOV challenges the legal sufficiency of the evidence, and we will affirm the denial of a JNOV motion when, viewing the evidence in a light most favorable to the prosecution, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Ross v. State*, 288 So. 3d 317, 321-22 (¶15) (Miss. 2020). "A conviction is sufficiently supported when it can be established, beyond a reasonable doubt, that every element of the offense was present." *Phillips v. State*, 285 So. 3d 685, 692 (¶26) (Miss. Ct. App. 2019), *cert. denied*, 284 So. 3d 754 (Miss. 2019). "We will reverse only where with respect to one or more of the elements of the offense charged, the evidence so considered is such that reasonable and fair minded jurors could only find the accused not guilty." *McCray*, 263 So. 3d at 1029 (¶24).

¶22. The Mississippi Supreme Court has stated:

> The critical inquiry is whether the evidence shows "beyond a reasonable doubt that [the] accused committed the act charged, and that he did so under such circumstances that every element of the offense existed; and where the evidence fails to meet this test it is insufficient to support a conviction." However, this inquiry does not require a court to ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt. Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

*Latiker v. State*, 918 So. 2d 68, 72 (¶10) (Miss. 2005) (citation omitted).

¶23. In addition, an appellant must state with specificity where the evidence falls short. In *Riley v. State*, 11 So. 3d 751, 753 (¶10) (Miss. Ct. App. 2008), Riley filed a motion for a JNOV or, alternatively, a new trial, arguing that "the verdict of the jury is contrary to law and the weight of evidence." But Riley was not specific about how the jury's verdict was contrary to law. *Id.* "A motion for a directed verdict on the grounds that the State has failed to make out a prima facie case must state specifically wherein the State has failed to make out a prima facie case." *Id.* Such specificity is also required in a motion for a JNOV. *Id.* If not specifically argued before the trial court, it is waived because issues may not be raised for the first time on appeal. *Id.*

¶24. "This Court's standard of review of a trial court's denial of a motion for a new trial [challenging the weight of the evidence] is abuse of discretion." *Goldsmith v. State*, 195 So. 3d 207, 212 (¶17) (Miss. Ct. App. 2016). When reviewing the denial of a motion for a new trial, we weigh the evidence in the light most favorable to the verdict and "will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it

9

to stand would sanction an unconscionable injustice." *Bishop*, 282 So. 3d at 641 (¶31). We are not required to decide—and in fact we must refrain from deciding—whether we think the State proved the elements." *Lenoir v. State*, 222 So. 3d 273, 279 (¶25) (Miss. 2017). "Rather, we must decide whether a reasonable juror could rationally say that the State did." *Id*.

¶25.     Easterling was convicted under Mississippi Code Annotated section 97-3-19(1)(a) (Rev. 2014), which defines first-degree murder as the following: "The killing of a human being without the authority of law by any means or in any manner . . . [w]hen done with deliberate design to effect the death of the person killed, or of any human being[.]"  In order to prove first-degree murder, the State must prove beyond a reasonable doubt that Easterling (1) killed McDonald; (2) without authority of law; and (3) did so with deliberate design to effect McDonald's death.

¶26.     In this case, the court properly instructed the jury on the elements of first-degree murder as follows:

> If you find from the evidence in this case beyond a reasonable doubt that: 1) On or about August 18, 2016, in Covington County, Mississippi; 2) Devontae Easterling unlawfully, without the authority of law, and with a deliberate design to effect the death of Joshua Lee McDonald killed Joshua Lee McDonald, a human being, by shooting Joshua Lee McDonald; then you shall find Devontae Easterling guilty as charged of first-degree murder.

Furthermore, the jury was instructed on the meaning of "deliberate design" as including "an intent to kill without authority of law, and not being legally excusable." Specifically, the jury instructions for "deliberate design" stated:

> "Deliberate" always indicates full awareness of what one is doing, and

10

generally implies careful unhurried consideration of the consequences. "Design" means to calculate, plan, or contemplate. "Deliberate Design" to kill a person may be formed very quickly, and perhaps only moments before the act of killing the person. However, a "deliberate design" cannot be formed at the very moment of the fatal act.[7]

¶27. Here, Easterling argues that "all of the physical evidence provided by the State at trial was circumstantial." Even the State's expert, he says, could not conclusively determine that the weapon found on Easterling was the gun that was used to kill the victim. Additionally, Easterling argues that the eyewitness, Clark, could not remember time the shooting occurred, what Easterling was wearing the day of the shooting, or how much time had elapsed before he (Clark) contacted the police. But Easterling fails to specify what evidence was lacking to prove any critical element of the crime. In essence, Easterling argues that in his opinion the evidence was weak, but he does not argue that it was insufficient to prove the crime was committed.

¶28. Accepting as true all the evidence favorable to the State, we find that the evidence was sufficient for the jury to find Easterling killed McDonald with deliberate design without authority of law. The State presented several witnesses, including an eyewitness who testified to seeing Easterling shoot McDonald deliberately, another witness who saw Easterling walk toward McDonald's car moments before the shooting, and an expert witness who identified that at least one of the shell casings from the scene of the shooting matched the handgun that was found on Easterling. Easterling's sole witness (his grandmother) made conflicting statements regarding Easterling's whereabouts prior to the shooting. Therefore,

---

[7] These jury instructions are appropriate as held in *Owens v. State*, 269 So. 3d 1280 (¶25) (Miss. Ct. App. 2018).

the court correctly denied the motion for a JNOV or new trial because there was sufficient evidence to support the jury's finding that Easterling was guilty of first-degree murder.

II.     **Whether the circuit court committed error in admitting the testimony of Lori Beall, the State's ballistic's expert.**

¶29.    Easterling argues that the circuit court erred in not striking the testimony of the State's ballistic expert Lori Beall because she compared a firearm's characteristics to fingerprints and because she stated that the science she used had no margin of error. At trial, Beall described the methodology for performing a firearms comparison, stating that "you can have consecutively manufactured firearms that have different characteristics. It's just like your fingerprints." The defense also argued that Beall's testimony should have been stricken because she could not give opinions to an absolute certainty. After review of the record, we find that the circuit court did not abuse its discretion in allowing Beall to testify.

¶30.    Lori Beall, the regional lab manager of the Mississippi Forensics Laboratory had testified as a ballistics expert witness thirty-four times. She said that the firearm taken from Easterling was a Jimenez 9mm semi-automatic handgun. Beall examined two fired casings, two unfired bullets from the crime scene, and a bullet retrieved from the body. Beall stated to a reasonable degree of scientific certainty that one of the fired casings was from Easterling's Jimenez 9mm handgun. But she was unable to determine whether the other casings, including the projectile, were spent from the same handgun.

¶31.    Being "mindful that 'the admission of expert testimony is within the discretion of the trial court, we will not reverse a trial court's decision to admit expert testimony unless the decision was arbitrary and clearly erroneous, amounting to an abuse of discretion.'" *Willie*

12

*v. State*, 274 So. 3d 934, 938 (¶12) (Miss. Ct. App. 2018), *cert. denied*, 272 So. 3d 130 (Miss. 2019).

¶32.    Under our modified *Daubert*[8] standard, expert testimony should be admitted under Mississippi Rule of Evidence 702 if the witness is qualified and the witness's testimony "assists the trier of fact in determining or understanding a fact at issue." *Koch v. State*, 222 So. 3d 1088, 1094 (¶21) (Miss. Ct. App. 2017). In *Mississippi Transportation Commission v. McLemore*, 863 So. 2d 31 (Miss. 2003), the Mississippi Supreme Court adopted the *Daubert* standard for determining the admissibility of expert witness testimony, stating:

> The United States Supreme Court in *Daubert* adopted a non-exhaustive, illustrative list of reliability factors for determining the admissibility of expert witness testimony. The focus of this analysis "must be solely on principles and methodology, not on the conclusions they generate." These factors include whether the theory or technique can be and has been tested; whether it has been subjected to peer review and publication; whether, in respect to a particular technique, there is a high known or potential rate of error; whether there are standards controlling the technique's operation; and whether the theory or technique enjoys general acceptance within a relevant scientific community. The applicability of these factors depends on the nature of the issue, the expert's particular expertise, and the subject of the testimony. The *Daubert* Court emphasized that the reliability inquiry contemplated by Rule 702 "is a flexible one."

*Id*. at 36-37 (¶13) (citations omitted).

¶33.    *Willie v. State* is instructive on the issues in this case. In *Willie*, the State offered Bryon McIntire as an expert in the field of toolmarking and firearm examination. *Willie*, 274 So. 3d at 936 (¶5). Despite the defense's objection, the circuit court ruled that McIntire was qualified and allowed his testimony. *Id*. McIntire testified that based on a "reasonable

---

[8] *Daubert v. Merrell Dow Pharm. Inc.*, 509 U.S. 579 (1993).

13

degree of scientific certainty," the shell casing found at the murder scene was fired from the 9mm handgun found in Lewis's SUV. *Id*. On appeal, Willie argued that circuit court erred in qualifying and allowing McIntire's testimony because it was conclusory, because the scientific methods were "questionable" and because McIntire did not provide a margin-of-error regarding the science of firearm identification. *Id*. We rejected these arguments. *Id*. at 939 (¶16).

¶34. Willie particularly took issue with McIntire's failure to provide a margin-of-error rate related to the method he utilized while also stating that he reached his conclusion to a reasonable degree of scientific certainty. *Id*. at (¶15). When asked by defense counsel about the margin of error, McIntire replied, "I understand what you're talking about with 'margin of error,' but we do not have a reporting procedure for a margin of error." *Id*. We did not find McIntire's failure to cite any margin of error warranted reversal. *Id*. at 939 (¶16). We noted the United States Supreme Court said in *Daubert*:

> The inquiry envisioned by Federal Rule of Evidence 702 is, we emphasize, a flexible one. Its overarching subject is the scientific validity and thus the evidentiary relevance and reliability of the principles that underlie a proposed submission. The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate.

*Id*. at 939 (¶16). Additionally, we acknowledged that other courts have supported the admissibility of such testimony and upheld an examiner's determination that a bullet or casing came from the defendant's gun to within a "reasonable degree of scientific certainty." Therefore, the circuit court did not err in qualifying McIntire as an expert or allowing his testimony. *Id*. at 940 (¶18).

14

¶35.    Here, like the expert in *Willie*, Beall testified that she formed her opinions within a "reasonable scientific certainty."  Beall determined that one of the casings found at the murder scene was fired from the firearm that the police later found on Easterling.  During direct examination of Beall, the State asked the following questions to which Beall responded:

> Q.    What test, if any, did you perform on this fire casing?
>
> A.    Part of my examination on the firearm is to test fire it. And I test fired this firearm six times. And I take my known test fires and I do a side-by-side comparison to the unknown to this casing.  So I did my side-by-side comparison where I looked for, first to verify class characteristics which would be the caliber and the shape of the fire pin impression on this casing to verify that they were the same. Once I verified the class characteristics, then I look for individual characteristics on those casings.
>
> Q.    What was the result?
>
> A.    I determined that this casing was fired in the firearm.
>
> Q.    And you say this firearm, which firearm are you referring to?
>
> A.    The Jimenez 9 millimeter, I'm not sure what exhibit, sir.  State's Exhibit Number 4 State's Exhibit 4, the casing in State's Exhibit 7 was fired in State's Exhibit 4.
>
> Q.    Based on your education, training and experience, are you able to say that within a reasonable degree of scientific certainty?
>
> A.    Yes.

Therefore, Beall's testimony was properly admitted.

¶36.    Easterling also takes issue with Beall's statement that the tool marks on guns were "just like your fingerprints."  But Beall was merely making an analogy to fingerprints to

15

illustrate for the jury that guns have individual characteristics.[9]  Easterling also argues that the circuit court should have given a limiting instruction to the jury regarding Beall's statement.  Beall's testimony was admissible, so there was no need for limiting instruction.  In addition, Easterling did not request limiting instruction during the trial.  Therefore, the issue was not preserved for appeal.[10]  We find no error here.

> **III.  Whether the circuit court committed error in denying Easterling's motion to suppress the admission of the handgun as evidence.**

¶37.  The State called Joseph Barnes, Easterling's arresting officer from the City of Collins Police Department, who testified that he found a gun in Easterling's back pocket.  Officer Barnes said he received a call from Deputy Anderson that Easterling "was going to turn himself in . . . and asked us to go the house."  When Officer Barnes and his partner arrived at Easterling's mother's house and were walking up the driveway, Easterling came out of the house.  Easterling headed toward them, and they met at the carport.  Officer Barnes asked Easterling to turn around.  Officer Barnes testified that he saw a firearm (later identified as a Jimenez 9mm handgun) in Easterling's back pocket in plain view.  After removing the firearm, Officer Barnes testified that he followed protocol, taking the magazine out of the firearm and checking to make sure that there was nothing in the chamber.

---

[9] Beall said (during her voir dire), "So therefore, the individual characteristics change from firearm to firearm.  You can have consecutively manufactured firearms that have different individual characteristics.  It's just like your fingerprints.  It's individual to you. A firearm is individual to that firearm."

[10] Pursuant to Mississippi Rules of Evidence 105, the burden to request a limiting instruction remains with trial counsel.  *Fulgham v. State*, 46 So. 3d 396, 399 (¶14) (Miss. Ct. App. 2010).

¶38. After the State questioned Officer Barnes outside the presence of the jury, the defense argued that the evidence of handgun should be suppressed because Officer Barnes had no search warrant. The court stated that under the *Terry* doctrine,[11] the plain-view doctrine, and due to a search incident to arrest, the officers legally seized the handgun.

¶39. Easterling argues that the circuit court erred in denying his motion to suppress the evidence of the handgun because the State did not have an arrest warrant or a search warrant when the gun was seized. Easterling also argues that use of the "*Terry* stop" doctrine or the "plain-view" and "search incident to arrest" doctrines did not justify the handgun's confiscation. For the following reasons, we find that the circuit court did not err.

¶40. "Taking into consideration the totality of the circumstances, this Court only reverses a trial court's denial of a motion to suppress if the trial court manifestly erred or ruled contrary to the overwhelming weight of the evidence." *Nowell v. State*, 246 So. 3d 77, 81 (¶17) (Miss. Ct. App. 2018).

¶41. "The Fourth Amendment of the United States Constitution and Article 3, Section 23 of the Mississippi Constitution guarantee a person's right to be free from unreasonable searches and seizures." *May v. State*, 222 So. 3d 1074, 1078 (¶7) (Miss. Ct. App. 2016). "As a general rule, our state and federal Constitutions prohibit searches without a valid warrant unless an exception applies." *Id*. "The State bears the burden to show that a warrantless search falls under one of the permissible exceptions." *Id*. "[E]xcepted from the warrant requirement are items within a police officer's plain view or plain feel." *Id*. at (¶8). If no

---

[11] *Terry v. Ohio*, 392 U.S. 1 (1968).

exception is found, the evidence seized as a result of the search "should be suppressed as fruit of the poisonous tree." *Id*. at (¶7) (quoting *Walker v. State*, 881 So. 2d 820, 827 (¶7) (Miss. 2004). "A search is not unreasonable when it is based on probable cause." *Id*. (quoting *State v. Woods*, 866 So. 2d 422, 427 (¶16) (Miss. 2003)). Probable cause for a warrantless search "exists where the facts and circumstances within the arresting officer's knowledge and of which he had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution to believe that an offense has been or is being committed." *Id*. at 1081 (¶18).

¶42.    The court supported its ruling under the three doctrines. Mostly used in cases of investigatory stops, the *Terry* doctrine states that "there must be a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime." *Terry v. Ohio*, 392 U.S. 1, 27, 88 S. Ct. 1868, 1883, 20 L. Ed. 2d 889 (1968). "[B]efore conducting an investigatory, or *Terry* stop, officers are required to have "reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in a felony . . . or some objective manifestation that the person stopped is or is about to be engaged in criminal activity." *Cooper v. State*, 145 So. 3d 1164, 1168 (¶11) (Miss. 2014). According to the plain-view doctrine, a police officer may seize an object in plain view if the officer can see it from a place he has a lawful right to be, the object's "incriminating character is readily apparent, and the officer has a lawful right of access to the evidence." *Hoskins v. State*, 172

18

So. 3d 1242, 1248 (¶12) (Miss. Ct. App. 2015).  A search incident to arrest is an "exception to the warrant requirement if founded upon the reasonable concern that the arrestee might have a weapon on his person or within reach, and that he may attempt to destroy evidence which is within his grasp."  *White v. State*, 735 So. 2d 221, 224 (¶8) (Miss. 1999).

> When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm.

*Cole v. State*, 242 So. 3d 31, 42 (¶32) (Miss. 2018) (quoting *Terry*, 392 U.S. at 24).

¶43.    Easterling argues that because Officer Barnes illegally trespassed on the property, any evidence found should have been excluded.  However, in *Waldrop v. State*, 544 So. 2d 834, 838 (¶56) (Miss. 1989), the Mississippi Supreme Court stated:

> It is not objectionable for an officer to come up upon that part of the property which has "been open to the public common use."  The route which any visitor to a residence would use is not private in the Fourth Amendment sense, and thus if police take that route "for the purpose of making a general inquiry" or for some other legitimate reason, they are free "to keep their eyes open . . . ."

(Citing 1 Wayne R. LaFave, *Search and Seizure*, § 2.3, at 318 (1978)).  This Court continued quoting the treatise by stating:

> Thus, when the police come on to private property to conduct an investigation or for some other legitimate purpose and restrict their movements to places visitors could be expected to go (e.g., walkways, driveways, porches), observations made from such vantage points are not covered by the Fourth Amendment.

*Id*. (citing 1 Wayne R. LaFave, *Search and Seizure*, § 2.3, at 318 (1978)).

¶44.    In this case, Officer Barnes had a legitimate reason to be at Easterling's grandmother's

19

house, namely to arrest Easterling who was turning himself in. When Easterling came outside and turned around as Officer Barnes requested, Officer Barnes saw the gun in his back pocket. Officer Barnes had the authority per *Terry*[12] to take necessary measures to protect himself and others around him, so a patdown of Easterling was warranted. Additionally, when Easterling turned around, Officer Barnes saw the firearm in plain view. Therefore, because Officer Barnes had a legitimate reason to be on the property, the gun was found during a search incident to arrest, and the handgun was in plain view, we find no error in the court's denial of the motion to suppress the evidence of the handgun.

IV. **Whether the circuit court committed error in granting the State's motion to suppress evidence regarding McDonald's toxicology report.**

¶45. Easterling argues that the circuit court erred in prohibiting the admission of McDonald's toxicology report, which showed that McDonald had ingested illegal drugs.[13] Easterling says the report was not offered to prove that McDonald acted in conformity with any violent tendencies, but instead it would be used as circumstantial evidence to prove that McDonald was a known drug dealer, which made him a target for murder.

¶46. "This Court reviews a trial court's admission or exclusion of evidence for an abuse

_____

[12] "Police officers may detain a person for a brief, investigatory stop consistent with the Fourth Amendment when the officers have 'reasonable suspicion, grounded in specific and articulable facts . . .' that allows the officers to conclude the suspect is wanted in connection with criminal behavior." *Eaddy v. State*, 63 So. 3d 1209, 1213 (¶14) (Miss. 2011) (quoting *Walker v. State*, 881 So. 2d 820, 826 (¶10) (Miss. 2004)).

[13] Although there is no order or hearing transcript on the motion to suppress McDonald's toxicology report, the court stated at trial the toxicology report would not be admitted.

20

of discretion." *Thompson v. State*, 157 So. 3d 844, 851 (¶20) (Miss. Ct. App. 2015). Mississippi Rule of Evidence 404 generally prohibits the admission of evidence of a person's character for the purpose of proving that he or she acted in conformity with that character on a particular occasion. M.R.E. 404(a). Evidence of "other crimes, wrongs or acts" is inadmissible as character evidence, but it may be admitted for other purposes, such as "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." M.R.E. 404(b). "[A] trial judge should filter the evidence through Mississippi Rule of Evidence 403 and determine whether the evidence's probative value outweighs its prejudicial effect to the defendant." *Shoemaker v. State*, 256 So. 3d 604, 613 (¶36) (Miss. Ct. App. 2018). "Where the evidence's probative value outweighs its prejudice, the trial judge may admit the evidence." *Id*. at 613-14 (¶36).

¶47. Easterling argues that the case which the State argued to suppress the toxicology report, *Lewis v. State*, 198 So. 3d 431 (Miss. Ct. App. 2016), is distinguishable from this case. However, the State used *Lewis* not to show a correlation between the facts of this case and *Lewis*, but to state the law regarding admissibility of a victim's intoxication. In *Lewis*, we said that "[i]n order for character evidence of a victim's intoxication to be admissible, the defendant must offer evidence of an overt act of aggression perpetrated against him by the victim and show that the alleged intoxication increased the victim's propensity for violence at the time of the crime." *Id*. at 434 (¶10).

¶48. In this case, Easterling failed to show how McDonald's toxicology report would have been relevant. Specifically, the defense argues that the evidence would have been used "to show that the victim was a well known drug user and distributor and that these facts were the

21

motivation behind the actions of true killer, Corey Barnes." This reason is attenuated at best. Showing that McDonald had drugs in his system shows he may have been a drug user, but it does not prove he was a drug dealer. No other proof was entered to establish that McDonald was a drug dealer or a target for murder. There was no evidence that McDonald acted aggressively toward Easterling. Because there is no evidence in the record that shows that toxicology report would have been used for a reason other than to show McDonald's character, we find no error in the court's decision.

**V.      Whether the circuit court committed error in failing to include the testimonies of Alexander Easterling and Tyisha Duckworth.**

¶49.    Easterling argues that the circuit court erred in excluding the testimonies of Alexander Easterling and Tyisha Duckworth. They both were expected to testify about conversations they had with another potential witness, Corey Barnes. Easterling claims that both testimonies were admissible under hearsay exceptions. At trial, Easterling's counsel stated that both Al's and Duckworth's testimony should have been allowed under Mississippi Rules of Evidence 803(1).[14] But, in his brief, Easterling argues that his trial counsel used the wrong hearsay exception and Mississippi Rules of Evidence 804(b)(3) (statement against interest) should have been used instead. Either way, we agree with the circuit court's ruling.

¶50.    Rule 804 contains hearsay exceptions applicable when the declarant is unavailable as a witness. Rule 804(b)(3) states:

> A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to

---

[14] Present sense impression is "a statement describing or explaining an event or condition, made while or immediately after the declarant perceived it." M.R.E. 803(1).

22

civil or criminal liability, or to render invalid a claim by him against another, that a reasonable man in his position would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

M.R.E. 804(b)(3). The three requirements must be met before a "statement against interest" may be admitted under this rule: (1) the declarant must be unavailable; (2) the statement must have clearly subjected the declarant to criminal liability; and (3) "corroborating circumstances" must "clearly indicate the statement's trustworthiness." *Small v. State*, 224 So. 3d 1272, 1276 (¶12) (Miss. Ct. App. 2017).

¶51. "The rule provides that a statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement." *Lacy v. State*, 700 So. 2d 602, 606 (¶14) (Miss. 1997) (citation and internal quotation mark omitted). Courts have considered the following factors in assessing reliability: "whether the guilt of the declarant is inconsistent with the guilt of the accused, whether the declarant was so situated that he might have committed the crime, the timing of the declaration and its spontaneity, the relationship between the declarant and the party to whom the declaration was made, and the existence of independent corroborating facts." *Hughes v. State*, No. 2018-CA-01506-COA, 2020 WL 634061, at *9 (¶59) (Miss. Ct. App. Feb. 11, 2020) (quoting *Lacy*, 700 So. 2d at 607 (¶17) (other citation omitted). "The corroboration requirement required by Rule 804(b)(3)(B) need not be 'absolute,' and 'the sufficiency of the corroboration must be assessed in light of the importance of the evidence and the offeror's fundamental constitutional right to present

23

evidence.'" *Id.* (quoting *Williams v. State*, 174 So. 3d 275, 281 (¶28) (Miss. Ct. App. 2014)).

## A.    Alexander "Al" Easterling's Proffered Testimony

¶52.    Al testified that Corey Barnes[15] told him that "next time he [Barnes] get a chance, he [Barnes] was going to kill and rob him [McDonald] and go to Texas." Al testified that the conversation occurred about two weeks prior to the shooting.

¶53.    The Mississippi Supreme Court stated that "corroboration requires that there must exist some circumstance in the making of the statement itself which would indicate its reliability . . . ." *Lacy v. State*, 700 So. 2d 602, 607 (¶16) (Miss. 1997) (citing M.R.E. 804(b)(3) cmt.). The statement's trustworthiness must be "clearly indicated." M.R.E. 804(b)(3). "Unless such a statement can be corroborated as reliable, it will be excluded." M.R.E. 804(b)(3), advisory committee note. In this case, Corey's statement had not been properly corroborated as required in Rule 804(b)(3). In *Lacy*, the Mississippi Supreme Court cited factors that can be considered in determining whether the corroboration requirement was met:

> Whether the guilt of the declarant is inconsistent with the guilt of the accused, whether the declarant was so situated that he might have committed the crime, the timing of the declaration and its spontaneity, the relationship between the declarant and the party to whom the declaration was made, and the existence of independent corroborating facts.

*Id.* In this case, Corey's statement was not properly corroborated as required in Rule. 804(b)(3). Corey did not appear at trial. There was no testimony that Corey and McDonald had a history of violent encounters or that there was animosity between them. More

---

[15] Although both parties subpoenaed Corey, he failed to appear in court.

importantly, Graves testified that Corey was in the car with her leaving the scene before the shooting occurred. Therefore, her testimony did not corroborate but instead contradicted the truthfulness of the hearsay statement.

¶54. Additionally, during his proffer, Al began to testify about a conversation that he had with Durr and about a conversation that Durr had with Corey on the day of the shooting. The court interrupted Al before he related the substance of that conversation between Durr and Corey.[16] Although we do not know what Corey may have said to Durr, such testimony is inadmissible as double hearsay, and the court correctly excluded it. Hearsay within hearsay is excluded by the rule against hearsay unless each part of the combined statements conforms with an exception to the rule. M.R.E. 805. In *Hawkins*, we found that double hearsay existed when a deponent merely stated another person's recollection of another employee's statements. *Hawkins v. Heck Yea Quarter Horses LLC*, No. 2016-CA-00215-COA, 2016 WL 9402885, at *3 (¶13) (Miss. Ct. App. Jan. 13, 2016), *aff'd*, 249 So. 3d 400 (Miss. 2018). In this case, we are uncertain about what Corey said to Durr, but we know when Durr was talking to Al, Durr was not making a statement against his [Durr's] interest. So there was no hearsay exception to that conversation. Like *Hawkins*, Al attempted to merely repeat the information that Durr told him regarding his [Durr] conversation with Corey. This is double hearsay and was properly excluded.

---

[16] The court should not have sustained any objection during proffer, but should have allowed Al to continue his testimony. "[W]hen testimony is not allowed at trial, a record of the proffered testimony must be made in order to preserve the point for appeal." *Young v. State*, 194 So. 3d 904, 908 (¶16) (Miss. Ct. App. 2016). "Without a proffer this Court cannot "know what testimony was excluded." *Id*. However, based on the record, Al's testimony was still hearsay and not subject to any exceptions.

## B. Tyisha Duckworth's Proffered Testimony

¶55. During her proffer, Duckworth testified in response to the defense's questioning as follows:

> Q. Tell the date and time . . . .
>
> A. Well, it was a day well, the day it happened was that night and I was getting off work from Sanderson Farms and I seen Corey Barnes in the apartments and he was like, what's up cuz. And I was like, nothing, what up. And he was like, you ain't heard. And I was like, no, heard what. And he was like, I knocked him off and I ain't got to worry about it no more . . . .
>
> Q. Coco Barnes came to you and is your understanding based on the totality of the conversation that he was referring to the death of Josh McDonald?
>
> A. I guess.
>
> STATE: Again, Your Honor. She said having to guess. This is hearsay.
>
> Q. I want you to just tell us what you know, what you think.
>
> A. I don't know what he was referring to. I don't know if he was talking about the death or what happened or what.

¶56. Duckworth could not conclusively state that Barnes was referring to McDonald. "[T]he proponent is required to show that the statement clearly and directly implicates the declarant himself in criminal conduct." *Fontaine v. State*, 256 So. 3d 615, 624 (¶28) (Miss. Ct. App. 2018) (quoting *Hartfield v. State*, 161 So. 3d 125, 136 (¶15) (Miss. 2015)). Moreover, there was no proof of corroborating circumstances indicating the trustworthiness of Barnes' statements. To the contrary, Graves testified that she left the scene with Barnes prior to the shooting, undermining the reliability of the hearsay statements of Barnes.

26

Accordingly, we find no error.

**VI.** **Whether the circuit court committed error in failing to allow lay person testimony regarding the possible source of gun powder residue found at the scene.**

¶57.    Easterling's next argues that the trial court erred when it sustained the State's objection to questions put to Clark about the gun residue found on his hands. The defense asked Clark about the gun shot residue that was found on him:

> Q.    Can you explain to the jury why they found gun shot residue on your hands that day?
>
> A.    Yeah because I guess I was in the car.

The State did not object. The defense further questioned Clark:

> Q.    You can't explain that can you?
>
> STATE: Objection, calls for speculation.
>
> STATE: Your Honor, gunshot residue is a scientific. It takes a scientific scientist to come up to - -
>
> THE COURT: Sustained.
>
> STATE: -- testify to that.
>
> Q.    Can you explain why you would have some gun particles on your body - -
>
> STATE: Same objection.
>
> THE COURT: Sustained.
>
> Q.    Do you deny that you had gun shot particles on your hand?
>
> STATE: Same objection.
>
> THE COURT: Sustained.

27

Contrary to appellant's argument, the jury did hear testimony from Clark, a layman, that he had gun residue on his hands. The jury also heard Clark's explanation of how he thought it got there. The State did not move to have the testimony stricken. That the circuit court sustained an objection to further questions does not negate the fact that Easterling's desired testimony was presented to the jury. The subsequent questions asked were merely repetitive. Therefore, this issue is without merit.

**VII.    Whether the circuit court committed error in granting the State's Motion to Exclude Testimony regarding prior criminal acts of Corey Barnes, Santana Keyes, Edmond Clark, and Joshua McDonald.**

¶58.    The admission or exclusion of evidence by the trial court is reviewed for abuse of discretion. *Horton v. State*, 253 So. 3d 334, 339 (¶16) (Miss. Ct. App. 2018). We will reverse the court's decision "only if such discretion has been abused and a substantial right of a party has been affected." *Id*.

¶59.    Generally, evidence of a victim's prior criminal acts are not admissible under Rule 404 of the Mississippi Rules of Evidence if entered to prove that the victim acted in accordance with his character. "Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." M.R.E. 404(b)(1). However, evidence may be admitted "for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." M.R.E. 404(b)(2). Evidence of a prior criminal history may also be used in some circumstances to impeach a testifying witness. M.R.E. 609. Under Rule 609(a), the following rules apply to attacking a witness's

28

character for truthfulness of that witness's criminal conviction by evidence of a criminal

conviction:

> (1) for a crime that, in the convicting jurisdiction, was punishable by death or by imprisonment for more than one year, the evidence:
>> (A) must be admitted, subject to Rule 403, when the witness is not a party; and
>> (B) must be admitted when the witness is a party, if the probative value of the evidence outweighs its prejudicial effect to that party; and
>
> (2) for any crime regardless of the punishment, the evidence must be admitted if the court can readily determine that establishing the elements of the crime required proving – or the witness's admitting – a dishonest act or false statement.

M.R.E. 609(a).

### A. Joshua McDonald (the deceased)

¶60. Easterling argues that McDonald's criminal history would have served as proof that he was a drug dealer and a target for murder. McDonald's criminal history includes felony and misdemeanor arrests and/or convictions for possession of controlled substance while in possession of a firearm, possession of marijuana, and DUI and other traffic related offenses. However, Easterling fails to show how McDonald's prior criminal offenses could possibly prove he was a drug dealer, which led to his murder. There were no charge relating to drug dealing and no testimony that McDonald was a drug dealer. There is no evidence of any conspiracy to kill McDonald because he was a dealer. Accordingly, McDonald's criminal record was irrelevant and immaterial.

### B. Edmond Clark

¶61. Easterling argues that Clark's prior criminal history would have served as proof that he had the motive and intent to participate in a conspiracy to kill McDonald. However,

Clark's criminal history includes a DUI and careless driving arrest/citation.[17] Easterling fails to show how a DUI and careless driving conviction could possibly prove that Clark had a motive to murder McDonald. Furthermore, none of Clark's prior criminal acts could have been used to impeach him as a witness under Rule 609, which limits impeachment to felony convictions or misdemeanors related to truthfulness.

### C. Corey Barnes

¶62. Easterling argues that "any evidence the previous arrests and convictions of Corey Barnes would not have been submitted to prove . . . he acted in accordance with said character, but rather to prove that he [had] the motive and intent." Specifically, Easterling argues that Corey's criminal record would have shown that Corey had a motive to rob and murder McDonald. Although, Corey's criminal history includes sale of cocaine and aggravated domestic violence, Corey failed to appear at trial.[18] Had he testified, these offenses may have been used to impeach him. But in his absence, his prior criminal acts could not be placed into evidence.

### D. Santana Keyes

¶63. Easterling argues that Keyes's "previous arrest and conviction combined with the other factual inferences show that she had a motive to help Corey Barnes rob and murder Joshua McDonald and frame the Defendant [Easterling]." Keyes had a criminal history of

---

[17] There is a reference to criminal history in the 1990s, which is not detailed.

[18] According to the record, Corey was in Texas and could not be located at the time of the trial.

sale of methamphetamine. However, like Corey, Santana Keyes did not testify at trial,[19] so her criminal acts could not be used for impeachment or placed into evidence without her testifying.

¶64. Finding the criminal history of the witnesses and the victim irrelevant and/or inapplicable under Rule 404(b) or its exceptions, we hold that this issue is without merit.

### VIII. Whether the circuit counsel's actions were "deficient" and whether the combined errors of the Easterling's counsel prejudiced Easterling.

¶65. [A] claim [for ineffective assistance of counsel] may be raised and addressed "on direct appeal if the presented issues are based on facts fully apparent from the record." *Story v. State*, No. 2018-KA-00464-COA, 2019 WL 5704135, at *5 (¶21) (Miss. Ct. App. Nov. 5, 2019), *cert. denied*, Order, No. 2018-CT-004640SCT (Miss. May 19, 2020). Specifically, this court addresses ineffective-assistance-of-counsel claims on direct appeal only where "[1] the record affirmatively shows ineffectiveness of constitutional dimensions, or [2] the parties stipulate that the record is adequate and the Court determines that findings of fact by a trial judge able to consider the demeanor of witnesses, etc., are not needed. *Bell v. State*, 202 So. 3d 1239, 1242 (¶12) (Miss 2016). "[G]enerally, ineffective-assistance-of-counsel claims are more appropriately brought during post-conviction proceedings." *Dartez v. State*, 177 So. 3d 420, 422-23 (¶18) (Miss. 2015). An appellate court is limited to the trial-court record in its review of the claims, and there may be instances in which insufficient evidence and/or information exists within the record to address the claim adequately. *Id*. In such a case, the

___

[19] According to the record, Keyes was in prison and not called as a witness at the time of the trial.

appropriate procedure is to deny relief, preserving the defendant's right to argue the issue through a motion for post-conviction collateral relief (PCR). *Id.*

¶66.    After reviewing the record, we do not find it prudent to address the ineffective-assistance-of-counsel issue at this time.  We find this issue best left for a PCR motion. Therefore, we decline to address the ineffective assistance of counsel issue.

## CONCLUSION

¶67.    Finding no merit to Easterling's claims, we affirm the conviction and sentence of the Covington County Circuit Court.  Easterling's claims of ineffective assistance of counsel are dismissed without prejudice to his right to raise those issues in a properly filed PCR motion.

¶68.    **AFFIRMED.**

**CARLTON AND J. WILSON, P.JJ., GREENLEE, WESTBROOKS, LAWRENCE, McCARTY AND C. WILSON, JJ., CONCUR.  BARNES, C.J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**